**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the
# Supreme Court of Georgia

No. S26A0154
Jerome Antonio Booze
v.
The State

On Appeal from the Superior Court of Cobb County
No. 17900615

Argued: January 20, 2026 — Decided: June 16, 2026

LaGrua, Justice.

In March 2019, Appellant Jerome Antonio Booze was convicted of rape in the Superior Court of Cobb County and sentenced to life imprisonment, to serve 35 years. Following the denial of his motion for new trial, Booze now appeals, contending that the trial court erred in denying his pretrial motion asserting that the rape statute, OCGA § 16-6-1(a)(1), was void for vagueness as applied to him; that the evidence was constitutionally insufficient; and that the trial court erred in connection with its instructions to the jury on the defense of mistake of fact and on constructive force. As explained below, these claims fail, and we affirm.[1]

Viewed in the light most favorable to the verdict, the evidence presented at trial showed the following: In December 2016, E.F. was a 20-year-old college student and was staying with her parents in their apartment in Cobb County over the holiday

---

[1] This case was docketed to the term of this Court beginning in December 2025 and orally argued on January 20, 2026.

break. On the night of December 9, E.F. went out with three of her girlfriends to celebrate a friend's 21st birthday. Over the course of the evening, E.F. had multiple alcoholic drinks, including champagne, mixed drinks, and shots of vodka or whiskey. In the early morning hours of December 10, E.F. and her friends left one bar and went to another bar, but E.F. was denied entry. According to the "most sober" friend, E.F. was "mouthing off to the security" and saying she wanted to "get in." When her friend tried to calm E.F. down and suggested they get food, E.F. "wasn't really making sense," was "slurring her words," "was stumbling when [the friend] was talking to her," and was not acknowledging what her friend was saying. The friend ordered a Lyft for E.F. because "I just felt like it was the safest option for her to just go home." The friend had to ask E.F. multiple times for the correct address because "the numbers were mixed up."

Booze, a 38-year-old Lyft driver, arrived at the second bar at 4:19 a.m. to pick up E.F. E.F. had to be helped to the car because she was stumbling and unable to walk without assistance; E.F. "flopped down into the back seat" of the Lyft and "went to sleep."

At 4:39 a.m., Booze and E.F. arrived at the gated entrance of the apartment complex where E.F.'s parents lived in Cobb County,[2] but they were not able to gain access through the gate.[3]

---

[2] The apartment complex had motion-activated surveillance cameras at the front gate, and several time-stamped video clips from the cameras were introduced into evidence and played at trial.

[3] An Atlanta Police Department officer who initially investigated the case, testified that, to gain access through the gate, "you either ring somebody in or you put in your code." E.F. testified that she did not have "a remote" to open the gate and that to gain access through the gate, "you just dial on the call box, and it will call the person's number. And then they press, like, a key, something on their phone to like open the gate."

For the next 45 minutes, Booze's car remained at the gate, and E.F. made numerous calls, trying to find someone who could help her get into the apartment complex. Several of the calls were to E.F.'s mother, but her mother had the ringer on her phone turned off and she did not answer the phone. E.F. left one voicemail for her mother, and the State played it at trial. E.F. is heard on the voicemail saying, in a pleading voice, "Mom, do you really hate me that much? I really do want to get inside." E.F. is also heard talking and mumbling, apparently to herself or to Booze. E.F.'s mother testified that E.F. sounded drunk and irrational on the voicemail.

E.F. also exchanged several phone and video calls with a college friend who lived in Florida. E.F. asked the college friend to call E.F.'s brother for help to open the gate to the apartment complex. The college friend described E.F.'s speech and demeanor as "not functionable." Booze also spoke to the college friend on more than one FaceTime call and told her that E.F. had thrown up. The college friend told Booze that she had not been able to reach E.F.'s brother and asked Booze not to leave E.F. alone. When the college friend was on the FaceTime call with Booze, E.F. appeared to be slouched or lying down in the back seat, with Booze in the front seat. Later, E.F. leaned out of the back seat, with Booze's help, and vomited on the ground. At another point, Booze and E.F. tried to walk through a pedestrian gate but were unable to open the gate. The video shows that Booze appeared to be guiding E.F. and helping her to stand up and walk.

Around 5:25 a.m., Booze moved his car to a parking area away from the main gate. Once parked, he got in the back seat with E.F. and had sex with her. Approximately 30 minutes later, Booze left the car, crawled under the front gate, propped open the pedestrian gate, returned to the car to get E.F., and helped E.F.

3

walk through the gate. Again, the video showed that E.F. was walking with Booze's help. After Booze helped E.F. through the pedestrian gate, he left E.F. at the bottom of the stairs that led to her parents' apartment.

E.F.'s mother was awakened about 6:00 a.m. by knocking on the front door. She looked out and saw E.F. leaning against the wall. She opened the door and immediately noticed a strong odor of alcohol and vomit. According to E.F.'s mother, E.F. was "really drunk," her eyes were "red and glassy," and she was stumbling and "steadying herself against the wall because her walking wasn't steady." E.F. went to bed, and when she woke up several hours later, she told her parents she had been raped, but she was unable to provide any details. E.F.'s parents took her to Grady hospital, where she underwent a sexual assault examination.[4] During the examination, E.F. complained of neck pain and "vaginal soreness." The nurse also confirmed that E.F. had a hematoma on her forehead and a contusion on the back of her neck.

A police report was made, and law enforcement officers ultimately identified Booze as the Lyft driver who took E.F. home. On January 18, 2017, Detective Ed Stockinger with the Cobb County Police Department contacted Booze and said he wanted to talk with him about one of his passengers being assaulted. Booze agreed to speak with the detective, and the interview occurred on January 23, at the detective's office. The 34-minute interview was audio- and video- recorded and played at trial. When first shown a picture of E.F., Booze said E.F. looked "kinda familiar" but he did not really remember her and that "it was a while ago." After Detective Stockinger told Booze that E.F. claimed she was raped,

---

[4] The parties stipulated that the sexual assault kit revealed that only E.F.'s DNA was present.

he read Booze his *Miranda*[5] rights, and Booze agreed to waive his rights and continued to speak with the detective.

After being shown several photos taken from the surveillance cameras at the apartment complex, Booze stated that he remembered the incident. He said they could not get through the gate, and E.F. started calling people to help her get in. Booze said he agreed to wait a few minutes, moved his car to the parking area, and ultimately got into the apartment complex by sliding under the gate and propping open a nearby pedestrian gate. He said he went back to "get her from [his] car" and walked E.F. to her building.

When asked about the hour and a half between arriving and walking through the pedestrian gate, Booze said "all he remembered" was that E.F. called friends, tried to call her mom, and threw up twice. He said he stayed with her, walked her to her building, and then left. After Booze was told that E.F. said he had sex with her in the back seat of the car, Booze mumbled and began to shake his head from side to side. The detective then said, "So tell me what your feelings is on that," and Booze responded, "If anything like that happened, it wasn't no rape." Detective Stockinger told Booze that E.F. had gone to the hospital and "had a rape kit done"; "they collected evidence out of her"; and "I don't know what happened in the back seat, all right? And she's claiming it happened in the back seat of your car." At that point, Booze acknowledged that he had sex with E.F., saying, "it happened in the back seat but it was no rape"; "she started kissing and biting on me"; and that he had sex with her "cause she kept grabbing on me. I mean, I'm a … man." He said repeatedly, "it was no rape." Booze also said that after E.F. threw

---

[5] *Miranda v. Arizona*, 384 US 436 (1966).

up, she was "fine." According to Booze, after the sexual encounter, E.F. was "having a conversation with me. It's not like she went and passed back out." In explaining why he got in the back seat, Booze said that E.F. "wasn't a bad looking female." Booze also said that if he had left E.F. by herself "she probably would've been laying in the grass." Booze was arrested at the conclusion of the interview.

After he was arrested, Booze made a phone call to his mother from jail. The call was recorded and a portion of it played at trial. In that call, Booze told his mother that E.F. "was drunk" but "wasn't all that drunk."

At trial, E.F. testified that she did not remember going to the second bar or being denied entry there, and that "a portion of the night … was blacked out." The next day, she had flashbacks of being in a car with a man; that she was on top of him; and that "someone had sex with me."

In his testimony at trial, which was generally consistent with the story he settled on in his statement to Detective Stockinger, Booze testified that E.F. initiated the sexual encounter. Booze also said that he does not drink alcohol and that he had a "clear [and] sober mind" that evening. Although Booze "assumed [E.F.] was drinking because [he] picked her up from a bar," he had no idea she was intoxicated "other than the two times she threw up [but] [t]hat could have meant anything." Booze said E.F. never sounded incoherent or slurred her words and she was able to walk steadily, without assistance. Throughout his testimony, Booze repeatedly denied seeing any signs of E.F.'s intoxication and had no explanation for why the witnesses who testified about the many signs of E.F.'s impairment testified as they did.

1. Prior to trial, Booze filed a motion to quash the indictment, asserting that the rape statute, OCGA § 16-6-1(a)(1),[6] was unconstitutionally vague as applied to him under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. In his motion, Booze acknowledged the well-settled case law "support[ing] a rape prosecution if the alleged victim was intoxicated to the point of being incapable of giving consent," but argued that because OCGA § 16-6-1(a)(1) provides no specific standards for determining the level of intoxication that renders a woman legally incapable of consenting to sexual intercourse, it failed to provide sufficient warning that he could be held criminally liable for rape under these particular circumstances. The trial court denied the motion, and Booze challenges that ruling on appeal.[7] We conclude that his challenge is without merit.

"The constitutionality of a statute presents a question of law that we review de novo," *Metz v. State*, 321 Ga. 402, 403 (2025), and in analyzing Booze's claim, we recognize that all statutes bear a presumption of constitutionality and that the party bringing the challenge bears a heavy burden to demonstrate that the statute is unconstitutional. See *Reyes v. State*, 318 Ga. 340, 347 (2024). See also *Metz*, 321 Ga. at 403 ("Before an Act of the legislature can be declared unconstitutional, the conflict between it and the fundamental law must be clear and palpable and this Court must be clearly satisfied of its unconstitutionality." (quotation marks omitted)); *Williams v. Powell*, 320 Ga. 221, 224 (2024) (noting that a "court

---

[6] OCGA § 16-6-1(a)(1) provides: (a) A person commits the offense of rape when he has carnal knowledge of:
(1) A female forcibly and against her will.

[7] We denied Booze's application for interlocutory review. See *Booze v. State*, S18I1103 (Ga. May 24, 2018).

must uphold a statute unless the party seeking to nullify it shows that it manifestly infringes upon a constitutional provision or violates the rights of the people").

The Due Process Clause "prohibits the government from taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *State v. Newsom*, 319 Ga. 607, 609 (2024) (quotation marks omitted). See also *Smallwood v. State*, 310 Ga. 445, 447 (2020) ("Vagueness invalidates criminal statutes that fail to provide clear warning to the average citizen of what conduct is criminally forbidden or fail to provide explicit standards for its enforcement to law enforcement officers." (quotation marks omitted)). And in considering whether a criminal statute fails to give fair notice to a defendant that he could be held criminally responsible for specific conduct, we may take into consideration how the statute has been construed by the courts. See *United States v. Lanier*, 520 US 259, 266–67 (1997) (explaining that "the touchstone" of the fair notice requirement for due process is "whether the statute, either standing alone or *as construed*, makes it reasonably clear at the relevant time that the defendant's conduct was criminal" (emphasis supplied)). See also *Davis v. State*, 306 Ga. 140, 151 (2019) (in addressing void-for-vagueness as-applied challenge to a criminal statute, relying on case law in construing the statutory language); 1 Wayne R. LaFave, Substantive Criminal Law § 2.3(b) (3d. ed., Oct. 2025 update) ("Words of a statute which otherwise might be considered unduly vague may be considered sufficiently definite because they have a well-settled meaning in the common law or in court decisions.").

8

We now turn to Booze's specific arguments that OCGA § 16-6-1(a)(1) is unconstitutionally vague as applied to him under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. First, Booze argues that the statute, which provides that "a person commits the offense of rape when he has carnal knowledge of [ ] [a] female forcibly and against her will" does not give fair warning that it criminalizes having sexual intercourse with a female who is voluntarily intoxicated. Second, he argues that even if a person could reasonably understand that conduct to be rape, the statute does not give fair warning of how intoxicated a female must be for sexual intercourse with her to become rape because the statute does not mention intoxication and lacks any specific standards regarding the level of intoxication sufficient to negate apparent consent.[8] We address each argument in turn.

As to his first argument, the law in Georgia has long been that "intercourse with a woman whose will is temporarily lost from intoxication … is rape." *Gore v. State*, 119 Ga. 418, 419 (1904).[9] As we explain in detail in Division 2, OCGA § 16-6-1 codified the common law crime of rape, and appellate decisions

---

[8] To the extent some of Booze's arguments under this enumeration of error attempt to raise facial or other constitutional challenges to OCGA § 16-6-1(a)(1) that he did not raise below, we do not address them as part of this enumeration of error. See *Williams v. Regency Hosp. Co., LLC*, 322 Ga. 452, 458 n.6 (2025) (declining to address constitutional issue that was not raised in the trial court). However, to the extent some of Booze's arguments under this enumeration are actually arguments about the proper interpretation of OCGA § 16-6-1(a)(1), we address those arguments in Division 2.

[9] As explained below in Division 2, although *Gore*, 119 Ga. at 418, predated our current rape statute, *Gore* applied the common law definition of rape, which we have held has been incorporated into OCGA § 16-6-1(a)(1). See *State v. Collins*, 270 Ga. 42, 42 (1998) ("In enacting a new criminal code in 1968, this state adopted the common-law definition of rape.").

addressing that offense have recognized that a person commits rape when he uses the force required to engage in the carnal act with a female whose will has been temporarily lost from intoxication. See id. See also *Mayes v. State*, 336 Ga. App. 55, 57–58 (2016) (in upholding rape conviction, concluding that the evidence was sufficient to show a lack of consent, noting, in part, evidence showing that the victim had become "very intoxicated"); *Turner v. State*, 312 Ga. App. 315, 318 (2011) (in discussing exceptions to Rape Shield Statute, concluding that appellant "would not have reasonably believed the victim consented to sex," given evidence that that the victim was intoxicated, was falling in and out of consciousness, and was unable to move or fight defendant off when he was raping her (quotation marks omitted)).[10] Thus, the language of the statute, which codified the common law crime of rape and brought our decisions construing that crime with it, gave fair warning that sexual intercourse with a female who has obviously lost her will due to intoxication is rape.

As for his argument that the statute does not give fair warning of the degree to which a female must be intoxicated for sexual intercourse with her to become rape, we note first that, to the extent that this might be understood as a facial vagueness challenge to the statute, we will not reach a facial vagueness challenge where the challenger has failed to mount a successful challenge to the statute as applied to him. See *Smallwood*, 310 Ga. at 447. So we consider first whether Booze has established that he lacked fair warning that having sexual intercourse with E.F. under the facts of his case could be prosecuted as rape. See *Metz*, 321 Ga. at 404 (in addressing due process challenge to

---

[10] Whether these Court of Appeals cases were rightly decided is not before us, and we express no view on that question.

criminal statute prohibiting lingering in area where "inmates are kept," explaining that relevant inquiry was not whether the defendant had actual notice of the precise boundaries he was not authorized to broach, but whether a person in his place would reasonably understand that inmates would be kept within the guard line of a prison). Here, we have little difficulty concluding that a person in Booze's place would reasonably understand from the signs of E.F.'s extreme intoxication that E.F. was not capable of consenting to sex. A person of ordinary intelligence reasonably would be aware that someone exhibiting multiple well-known signs of incapacity from extreme intoxication, like significantly slurred speech, slipping in and out of consciousness, and an inability to walk without assistance, likely would not be able to understand the nature or consequences of engaging in sexual intercourse at that time, and thus would not have the ability to consent to the act. And those signs were readily apparent based on the evidence presented here, which showed that Booze, who was sober, picked E.F. up around 4:30 a.m. from outside a bar; E.F. needed assistance getting into the car; she could not stay awake during the short drive to her apartment complex; her speech was very slurred and, at times, incoherent; she vomited twice; she could barely stand or walk without assistance; and Booze believed she would be "laying in the grass" if he left her alone. See *Mayes*, 336 Ga. App. at 56–58. Thus, whether or not a person of ordinary intelligence would have fair warning that having sexual intercourse with an intoxicated female could be prosecuted of rape under a different, less extreme set of circumstances, Booze has not met his burden of showing that OCGA § 16-6-1(a)(1) is unconstitutionally vague as applied to him, given these obvious signs of E.F.'s extreme intoxication. See *Metz*, 321 Ga. at 404–05 (rejecting void-for-vagueness as-applied challenge to statute that prohibited lingering, loafing, or standing

11

around where inmates "are kept" after being ordered to leave, where a reasonable person would understand that inmates are kept within the guard line of correctional institutions and the terms "linger, loaf, or stand around" had consistent meanings since 1903); *Derrico v. State*, 306 Ga. 634, 635 (2019) (rejecting void-for-vagueness as-applied challenge to statute prohibiting "operat[ing] any motor vehicle with the intent to … intimidate … another person," where evidence showed that the defendant attempted to overtake another vehicle by passing on the right, hit the other vehicle on the passenger side while moving back to the left lane, and then slowed down and moved into the emergency lane to strike the other vehicle on the driver's side). See also *Cook v. State*, 220 Ga. 463, 465–66 (1964) (rejecting facial vagueness challenge to statute making it unlawful to operate a vehicle "while under the influence of intoxicating liquor" and relying on cases from other courts that held that "while under the influence of intoxicating liquor" has a "well-recognized meaning").

Booze's reliance on cases such as *Johnson v. Athens-Clarke County*, 272 Ga. 384 (2000), and *Thelen v. State*, 272 Ga. 81 (2000), is misplaced. In *Johnson*, we held that a city's loitering ordinance was void for vagueness because it criminalized standing or sitting in a "known drug area," and an innocent person unfamiliar with the area's drug culture would not have notice that such behavior was prohibited. 272 Ga. at 387. In *Thelen*, we held that a county's noise ordinance was unconstitutionally vague as applied because it required a "completely subjective standard" as to whether a noise "annoys … others." 272 Ga. at 82. In both cases, we were presented with ordinances that imposed criminal liability based on subjective knowledge without any limiting parameters. In neither case were we addressing, as here, a statute that followed the common law and that had been interpretated consistently in case law for over

12

a hundred years of interpretative case law. Additionally, here unlike in *Johnson* and *Thelen*, a person of ordinary intelligence would have fair notice from the statute, as construed in our case law, that the conduct at issue in this case could subject him to criminal liability.

For all these reasons, Booze's due-process claim fails.[11]

2. Having determined that the statute is not unconstitutionally vague as to Booze, we now turn to his second argument. Booze asserts that the evidence was insufficient as a matter of constitutional due process, see *Jackson v. Virginia,* 443 US 307, 319 (1979), because the long-standing case law discussed above—that, in cases where the victim's will is lost due to intoxication, constructive force satisfies the "forcibly" element—is contrary to the text of OCGA § 16-6-1(a)(1). Specifically, Booze argues that while the appellate courts' case law relies on the common law rule, OCGA § 16-6-1(a)(1) does not incorporate the common law definition of rape, and therefore, existing case law is contrary to the text of the statute. However, as explained below, OCGA § 16-6-1(a)(1) does incorporate the common law definition of rape, and with that understanding of the elements of rape, we

---

[11] Booze also summarily asserts that OCGA § 16-6-1(a)(1) contains "no objective, explicit, standards for those who enforce the law, which means that the law is susceptible to selective and arbitrary enforcement, and policy matters are impermissibly delegated to police officers, prosecutors, and juries." However, Booze did not include any substantive argument to support the arbitrary-enforcement aspect of a due-process claim, and thus he has not met his burden to show that that the statute is unconstitutionally subject to selective and arbitrary enforcement. See *Davis v. State*, 306 Ga. 140, 152 (2019) (concluding that as-applied vagueness challenge failed where the appellant "articulated no cogent argument as to how the [statute] is constitutional as applied"). See also *Newsom*, 319 Ga. at 609 n.2 (declining to address arbitrary-enforcement aspect of vagueness analysis where no such argument was presented).

conclude that the evidence was sufficient as a matter of constitutional due process to sustain Booze's conviction.

As an initial matter, we note that this Court previously stated that, in enacting a new criminal code in 1968, the legislature adopted the common law definition of rape in OCGA § 16-6-1. See *State v. Collins*, 270 Ga. 42, 42 (1998).[12] Our statement in *Collins* is consistent with our long-standing case law. Specifically, in 1904, we construed the 1895 statute defining rape—i.e., "Rape is the carnal knowledge of a female forcibly and against her will"—and noted that "[t]his is the common-law definition as given by Blackstone." *Gore v. State*, 119 Ga. 418, 419 (1904) (citing Penal Code of 1895 § 93). Importantly, the statute we construed in *Gore* contained the same essential elements of the offense of rape as OCGA § 16-6-1(a)(1) does now. And our analysis in *Gore* recognized that constructive force satisfies the "forcibly" element when the victim's will has been temporarily lost, holding that, "when the man does not suppose that he has [the victim's] consent[,] the force required and which is involved in the carnal act is sufficient." *Gore*, 119 Ga. at 421. In other words, when the State relied on constructive force to establish the "forcibly" element in a rape prosecution, the State had to prove that the "carnal act" occurred when the woman was intoxicated

---

[12] In *Collins*, we reviewed the Court of Appeals's reversal of an appellant's rape conviction against a 12-year-old girl on the basis that the State failed to prove the element of force. 270 Ga. at 42. We affirmed, reiterating that, under our prior case law, the State "must prove the element of force to obtain a conviction for forcible rape against a victim under the age of consent," 270 Ga. at 42, which differed from the common law rule that the element of force was not required to prove rape when a man had sexual relations with a girl under 10 years of age. Id. at 45. However, the following year, the legislature enacted OCGA § 16-6-1(a)(2), which incorporated the common law rule providing that "carnal knowledge" is the sole element of rape when the victim is a female less than 10 years of age. See Ga. L. 1999, p. 666 § 1.

to such a significant degree that she had temporarily lost her ability to consent. Id. at 419–21.

This understanding of the elements of rape continued up to the adoption of the current criminal code in 1968. See, e.g., *Evans v. State*, 67 Ga. App. 631, 632 (1942) (stating that "intercourse with a woman whose will is temporarily lost from intoxication, or unconsciousness arising from the use of drugs or other cause, or sleep, etc., is rape"). Additionally, as noted above, the rape statute enacted in 1968 set forth the same essential elements as provided in our prior statutes and construed in the case law—rape requires proof of carnal knowledge of a woman, forcibly, and against her will. See Ga. L. 1968 at 1249, 1299.[13] It is well settled that the "legislature is presumed to enact statutes with full knowledge of existing law, including court decisions." *McIver v. State*, 314 Ga. 109, 120 (2022). See also *Olevik v. State*, 302 Ga. 228, 237 (2017) (in context of constitutional interpretation, explaining prior-construction canon). Thus, when OCGA § 16-6-1 was enacted with a definition of rape that was materially identical to the preexisting definition that had been consistently and definitively construed to incorporate this concept of constructive force, that construction was carried forward into the new statute. See id. Accordingly, Booze's challenge to our case law fails.

With this understanding of the essential elements of the crime of rape: carnal knowledge of a woman (i.e., penetration of

---

[13] The statutory elements of rape did not change between 1895, the statute applied in *Gore*, 119 Ga. at 418, and the enactment of our current statute. See Penal Code of 1895 § 93 ("Rape is the carnal knowledge of a female, forcibly and against her will."); Penal Code of 1910 § 93 (same); Code of 1933, § 26-1301 (same); Ga. L. 1968 at 1299 ("A person commits rape when he has carnal knowledge of a female, forcibly and against her will."); OCGA § 16-6-1(a) (A person commits the offense of rape when he has carnal knowledge of: (1) A female forcibly and against her will.").

the female sex organ by the male sex organ), forcibly and against her will and the proof required to show constructive force, here, that the woman was intoxicated to such a significant degree that she had temporarily lost her ability to consent, we evaluate Booze's challenge to the constitutional sufficiency of the evidence. In analyzing such a claim, we view the evidence in the light most favorable to the verdict, asking whether the evidence presented at trial was sufficient to authorize a rational trier of fact to find the appellant guilty beyond a reasonable doubt of each essential element of the crime for which he was convicted. See *Weems v. State,* 318 Ga. 98, 101 (2024) *(*citing *Jackson,* 443 US at 319). "In making this determination, we do not evaluate witness credibility, resolve inconsistencies in the evidence, or assess the weight of the evidence; these tasks are left to the sole discretion of the jury." *Ridley v. State*, 315 Ga. 452, 455 (2023).

When properly viewed in the light most favorable to the verdict, the evidence presented at trial and summarized above was sufficient as a matter of constitutional due process to authorize the jury to find Booze guilty of rape. Specifically, the evidence showed that Booze had sex with E.F. while she was extremely intoxicated and unable to consent. The evidence showed that when Booze picked up E.F. around 4:00 a.m. outside a bar, she had to be helped into the car at which point she "flopped" into the back seat and fell asleep on the 20-minute ride home. When they arrived at E.F.'s apartment complex, she threw up twice; slurred her words, speaking incoherently at times; and could not walk without assistance. In summary, this evidence authorized the jury to conclude that Booze had sex with E.F. when E.F. was intoxicated to such a significant degree that she had lost the ability to consent, and accordingly the evidence was sufficient as a matter of constitutional due process. This case is similar to *Arroyo v. State*, 372 Ga. App. 366, 373 (2024), in which

16

the Court of Appeals affirmed the defendant's rape conviction, concluding that evidence that the victim drank heavily, was unconscious or asleep at various points, and had no memory of meeting the defendant was sufficient "evidence of extreme intoxication from which a jury could infer an incapacity to consent." See also *Rendon-Villasana v. State*, 360 Ga. App. 769, 774–75 (2021) (affirming rape conviction and concluding that the evidence was sufficient to show constructive force where there was evidence that the victim was "highly intoxicated and asleep"); *Cook v. State*, 338 Ga. App. 489, (2016) (affirming rape conviction and concluding that the evidence was sufficient to establish constructive force where the victim had been drinking earlier in the evening, and after drinking shots of alcohol, vomited uncontrollably and "was in and out of consciousness"). See also *Johnson v. State*, 351 Ga. App. 690, 694 (2019) (concluding that the evidence was sufficient to support a conviction for sexual battery despite defendant's claim that the sexual contact was consensual given the evidence showing that due to intoxication, the victim's will was temporarily lost where "victim vomited, required assistance to walk, and lost consciousness").

Additionally, the jury heard Booze's changing explanations to Detective Stockinger about what happened the night of the incident—at first, he "kinda" remembered E.F.; then, he remembered taking her to the apartment complex, repeating several times details from the first arrival at the gate until he walked her to her parents' apartment, but never saying that he had sex with her in the car; after being confronted with E.F.'s allegation, he said "If anything like that happened it wasn't–it wasn't no rape"; and finally, he said that E.F. initiated the sexual encounter and that it was consensual. The jury also heard Booze's testimony in which he claimed, despite copious evidence to the contrary, that E.F. did not need assistance to walk, that she never

17

slurred her words or sounded incoherent, and that she showed no signs of intoxication at all. If the jury disbelieved Booze, it could consider his testimony as substantive evidence of guilt. See *Foots v. State*, 322 Ga. 116, 119 (2025) (explaining that if a jury disbelieved the defendant's testimony, it "could also consider his testimony as substantive evidence of guilt where there was some corroborative evidence pointing to guilt"). Likewise, the jury was not required to credit Booze's story that E.F. initiated the sexual encounter. See id.; *Ridley*, 315 Ga. at 455. Accordingly, Booze's challenge to the constitutional sufficiency of the evidence fails.

3. Finally, Booze enumerates as error the trial court's jury instruction on mistake of fact and the trial court's failure to give Booze's requested instruction on "intent to use force." Where, as here, an appellant properly preserves a claim of instructional error for ordinary appellate review by objecting at the conclusion of the trial court's charge, see OCGA § 17-8-58(a), we review the claim de novo. See *Eubanks v. State*, 317 Ga. 563, 581 (2023). And we will not reverse for instructional error when the jury charges "taken as a whole, sufficiently instruct[] the jury on a point of law." *Campbell v. State*, 320 Ga. 333, 360 (2024).

(a) Booze argued at trial that if the jury believed that he did not know E.F. was extremely intoxicated, he should be acquitted, even if E.F. was in fact too intoxicated to consent. He wanted a mistake-of-fact jury instruction charge based on this argument, and he argues on appeal that the trial court improperly added language to the standard mistake-of-fact instruction. We disagree.

The mistake-of-fact instruction given at trial began with the language of the pattern charge: "A person shall not be found guilty of a crime if the act constituting the crime was induced by a misapprehension of facts that if true would have justified the

18

act."[14]   See Georgia Suggested Pattern Jury Instructions, Criminal Cases, § 3.40.10. However, over Booze's objection, the trial court added a sentence, which was drawn from appellate cases, stating, "Mistake of fact does not constitute a defense to a criminal charge if it is superinduced by the fault or negligence of the party doing the wrongful act alleged." See, e.g., *Crawford v. State*, 267 Ga. 543, 544 (1997) (noting that, "generally speaking, ignorance or mistake of fact constitutes a defense to a criminal charge only if it is not superinduced by the fault or negligence of the party doing the wrongful act" (cleaned up)).

In setting forth his argument, Booze correctly notes that the pattern jury instruction for mistake of fact is virtually identical to OCGA § 16-3-5,[15] and that the additional language challenged on appeal is found in case law explaining why an instruction on mistake of fact was not warranted in a particular case. See, e.g., *Gabriel v. State*, 280 Ga. 237, 240 (2006) (concluding that there was no error in not giving mistake-of-fact charge where any mistake on defendant's part was due to his own negligence in firing blindly at an unidentified noise); *Crawford*, 267 Ga. at 544 (concluding that there was no error in not giving mistake-of-fact charge where "any mistake on Crawford's part as to the identity of his intended target was solely the result of his own failure to identify the source of the noise before he fired").

With respect to this case law, Booze argues that "the courts' reasoning for not giving the mistake of fact charge [in *Crawford* and other] cases does not mean that a trial court can agree to give

---

[14] Booze does not assert any error with respect to the first sentence.

[15] OCGA § 16-3-5 provides, "A person shall not be found guilty of a crime if the act or omission to act constituting the crime was induced by a misapprehension of fact which, if true, would have justified the act or omission."

a mistake of fact charge and then add language to that charge, especially when adding the 'superinduced' language … adds a line to OCGA § 16-3-5, which oversteps the Constitutional requirement of separation of powers." However, Booze has not cited any cases, and we have found none, in which we have held that a jury instruction is improper on separation-of-powers grounds simply because a pattern jury instruction, which is based on a statute, was modified by the trial court. And we are unaware of any case in which we have held that language from an appellate court opinion setting forth an otherwise correct proposition of law can never be appropriate for a jury instruction. Finally, the additional language included by the trial court in the mistake-of-fact instruction is a correct principle of law, see *Gabriel*, 280 Ga. at 240, and Booze does not argue otherwise. Nor does Booze argue that this principle was not authorized by the evidence in this case. See *Hudson v. State*, 308 Ga. 443, 445 (2020) ("A request to charge must be legal, apt, and precisely adjusted to some principle involved in the case and be authorized by the evidence."). Because the language added to the mistake-of-fact charge was a correct legal principle, the trial court did not err in including this language in the charge. See *Gold v. State*, 319 Ga. 149, 151 (2024) (holding that trial court did not err in giving jury instructions that were "a correct statement of the law").

(b) Booze also asserts an error with respect to the trial court's instruction on constructive force which, as explained above in Division 2, is a long-standing principle applicable in rape cases where the victim is physically or mentally unable to give consent. The trial court gave the following jury instruction on constructive force:

> If you find that the alleged victim was physically or mentally incapable of giving intelligent consent to

20

the act, the requirement of force is found in the constructive force; that is, the use of such force that is necessary to effect the penetration made by the defendant. Whether or not you find such constructive force is a matter for you the jury to determine.

Booze contends that the trial court erred by failing to include the following language in this instruction: "But even in cases of this kind, the State must prove the Defendant's intent to use force beyond a reasonable doubt."[16] Booze argues that his requested language means that, if the State relies on constructive force to establish the "forcibly" element, the State would have to prove the defendant had the intent to use force if the victim resisted. Booze argues that the requested language is a "modernized" version of language from a treatise discussing constructive force in rape cases and stating, "The intent to use force, however, in case fraud or stupefaction should fail, is essential to the offense." 1 Wharton, Criminal Law and Procedure § 307 (1957). We quoted this "stupefaction" language from Wharton's treatise in *Drake v. State*, 239 Ga. 232, 235 (1977). Booze relies solely on *Drake* to support his argument about the constructive force jury instruction, but we are not persuaded.

---

[16] The full constructive force charge requested by Booze was:
If you find that the alleged victim was incapable of intelligently consenting to the act, then the lack of actual force necessary to overcome a resistant victim in other cases is supplied constructively by the rule that no more force need be used to effect the penetration made by the defendant. *But even in cases of this kind, the State must prove the Defendant's intent to use force beyond a reasonable doubt.* (emphasis supplied).

As an initial matter, *Drake* did not involve a question of whether the victim was capable of consenting due to intoxication,[17] so *Drake* is not binding precedent on the requirements for proving constructive force in such cases. See *Schoicket v. State*, 312 Ga. 825, 832 (2021) ("It is, of course, axiomatic that a decision's holding is limited to the factual context of the case being decided and the issues that context necessarily raises. Language that sounds like a holding — but actually exceeds the scope of the case's factual context — is not a holding no matter how much it sounds like one.").

Additionally, in Division 2 above, we discussed the elements of rape when the State relies on constructive force. After reviewing our statutes and case law, we reiterated that, to establish the offense of rape, the State must prove that the defendant had carnal knowledge of a woman (i.e., penetration of the female sex organ by the male sex organ), forcibly, and against her will. And when the State relies on constructive force based on the victim's intoxication to establish the "forcibly" element, the State must prove that the woman was intoxicated to such a significant degree that she had temporarily lost her ability to consent. Importantly, these well-established elements of rape do not include the specific intent to rape, which is consistent with other case law holding that rape is a general, not specific, intent crime. See *Wright v. State*, 365 Ga. App. 288, 291 (2022) (holding that rape is a "general intent" crime and that the trial court did not err in giving "general intent" instruction in rape prosecution). See also *Arroyo*, 372 Ga. App. at 373 (holding that a charge that

---

[17] In *Drake*, we affirmed Drake's conviction for the forcible rape of his nine-year-old daughter, concluding that the element of force was shown by evidence of Drake's use of intimidation against the victim. See *Drake*, 239 Ga. at 235–36.

was substantially the same as the one given in this case is a correct statement of the law). Thus, contrary to Booze's argument, there is no basis in our case law or in the common law that we have found that supports requiring that the trial court charge the jury in constructive force cases on the additional language that Booze requested.

Here, the record reflects that the trial court properly charged the jury on the elements of rape and on the State's burden to prove all the elements of the offense beyond a reasonable doubt.[18] Thus, considering the applicable law and the jury charges as a whole, we cannot say that the trial court erred in failing to include Booze's requested language in the jury instruction on constructive force. See *Woschula v. State*, 322 Ga. 784, 786 (2025) ("A trial court does not err by refusing to give a requested instruction that is not a correct statement of law.").

Accordingly, Booze's challenges to the jury instructions fail, and we affirm his conviction.

---

[18] Booze has cited no other cases, and we have found none, in which we (or the Court of Appeals, which generally reviews appeals from rape convictions) have applied the principle of law that *Drake* quotes from the treatise regarding "the intent to commit rape … in case fraud or stupefaction should fail" in constructive force cases. And we note that the treatise quoted in *Drake,* 1 Wharton, Criminal Law and Procedure § 307 (1957), cites several cases for this proposition, but only one is from Georgia, *Taylor v. State*, 50 Ga. 79 (1873). *Taylor*, however, involved an indictment charging assault with intent to commit rape, not rape itself. To the extent *Drake* can be read as adopting the proposition that, in constructive force cases, the State is required to prove that the defendant had the specific intent to rape the victim if "fraud or stupefaction should fail," or that in constructive fraud cases the State must prove that the defendant had a specific intent to rape the victim if she resisted, it is hereby disapproved.

*Judgment affirmed. All the Justices concur.*

WARREN, Presiding Justice, concurring.

Although I concur in the majority opinion, I write separately to emphasize the standard of review this Court applies when evaluating a constitutional challenge to a statute passed by the General Assembly.  For decades, our Court has routinely articulated that

> It is axiomatic that all presumptions are in favor of the constitutionality of a statute.  Before an Act of the legislature can be declared unconstitutional, the conflict between it and the fundamental law must be clear and palpable and this Court must be clearly satisfied of its unconstitutionality.  And because a statute is presumed valid, the burden is on the party claiming that the law is unconstitutional to prove it.

*Metz v. State*, 321 Ga. 402, 403 (2025) (cleaned up).[19]  See also, e.g., *Stephens v. State*, 321 Ga. 651, 651 (2025); *Sumrall v. State*, 320 Ga. 617, 622 (2024); *Session v. State*, 316 Ga. 179, 191-92 (2023); *Taylor v. Devereux Found., Inc.*, 316 Ga. 44, 52-53 (2023); *Barnhill v. Alford*, 315 Ga. 304, 311 (2022); *Ammons v. State*, 315 Ga. 149, 163 (2022); *McInerney v. McInerney*, 313 Ga. 462, 467

---

[19] Indeed, this "clear and palpable" aspect of the standard traces back to 1846—the first year in which the Supreme Court of Georgia reported decisions.  See *Craig v. Maltbie*, 1 Ga. 544, 547 (1846) (explaining that a court is justified in declaring a statute unconstitutional only if "the opposition between the constitution and the law … [is] plain and palpable"); *Flint River Steamboat Co. v. Foster*, 5 Ga. 194, 209 (1848) ("It must be a very clear and palpable case, which would warrant the Judiciary to exercise this delicate duty of declaring a law unconstitutional[.]").

(2022); *Kemp v. Gonzalez*, 310 Ga. 104, 106 (2020); *S&S Towing & Recovery, Ltd. v. Charnota*, 309 Ga. 117, 118 (2020); *Heron Lake II Apartments, LP v. Lowndes Cnty. Bd. of Tax Assessors*, 306 Ga. 816, 825 (2019); *Georgia Dep't of Hum. Servs. v. Steiner*, 303 Ga. 890, 894 (2018); *Ellis v. State*, 300 Ga. 371, 378-79 (2016); *Zarate-Martinez v. Echemendia*, 299 Ga. 301, 305 (2016); *City of Columbus v. Georgia Dep't of Transp.*, 292 Ga. 878, 880 (2013); *JIG Real Est., LLC v. Countrywide Home Loans, Inc.*, 289 Ga. 488, 490 (2011); *DeKalb Cnty. v. Perdue*, 286 Ga. 793, 794 (2010); *Dev. Auth. of DeKalb Cnty. v. State*, 286 Ga. 36, 38 (2009); *Cobb Cnty. v. Campbell*, 256 Ga. 519, 519 (1986); *City of Calhoun v. N. Georgia Elec. Membership Corp.*, 233 Ga. 759, 760-61 (1975); *Fulton Cnty. v. Woodside*, 222 Ga. 90, 96 (1966); *Nash v. Nat'l Preferred Life Ins. Co.*, 222 Ga. 14, 17 (1966); *Lamons v. Yarbrough*, 206 Ga. 50, 57 (1949); *Cooper Co. of Gainesville v. State*, 187 Ga. 497, 497 (1939); *Floyd Cnty. v. Scoggins*, 164 Ga. 485, 485 (1927); *S. Ry. Co. v. Payne*, 138 Ga. 18, 18 (1912); *L.B. Price Co. v. City of Atlanta*, 105 Ga. 358, 358 (1898); *Wellborn v. Estes*, 70 Ga. 390, 396 (1883).

The "clear and palpable" portion of this standard is important, because it illustrates the magnitude of the burden a plaintiff must meet to prevail on a constitutional challenge to a statute. Indeed, the "clear and palpable" modifier helps illustrate how a trial court—and later an appellate court—should assess a plaintiff's "heavy" burden. See, e.g., *Stephens*, 321 Ga. at 651 ("State statutes are presumed constitutional, and the challenger faces a heavy burden to prove otherwise: he must establish that the conflict between the challenged law and our Constitution is clear and palpable, and we must be clearly satisfied of its unconstitutionality to declare it so." (quotation marks omitted)); Majority Opinion at 7. And although the majority opinion relegates the "clear and palpable" portion of the standard to a

25

parenthetical to a citation, see Majority Opinion at 7, I do not understand it to be deviating from this well-settled standard—as should be clear by its citation to *Metz*.

With that understanding, I concur.

I am authorized to state that Justice Bethel, Justice McMillian, Justice Pinson, and Justice Land join in this concurrence.